WYC:KVH:SK
F.#2010R00717

**M-10-804**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

YEFIM DRAKHLER,
EVGENY GIL,
YEFIM KORNFELD,
VALENTINA MUSHINSKAYA,
SHELYA PINKSKAYA and
VLADIMIR RUBIN,

        Defendants.

- - - - - - - - - - - - - - - - -X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANTS

(T. 18, U.S.C., §§ 371 and
3551 et seq.)

EASTERN DISTRICT OF NEW YORK, SS:

      DANIEL CONNOR, being duly sworn, deposes and says that he is a Special Agent with the United States Department of Health and Human Services, Office of the Inspector General, duly appointed according to law and acting as such.

      Upon information and belief, there is probable cause to believe that in or about and between January 2009 and April 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants YEFIM DRAKHLER, EVGENY GIL, YEFIM KORNFELD, VALENTINA MUSHINSKAYA, SHELYA PINKSKAYA and VLADIMIR RUBIN, together with others, did knowingly and willfully conspire to solicit and receive cash kickbacks, directly and indirectly, overtly and covertly, in return for referring Medicare beneficiaries to Solstice for the

furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Medicare, and in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under Medicare, contrary to Title 42, United States Code, Section 1320a-7b(b)(1).

(Title 18, United States Code, Sections 371 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been a Special Agent with the United States Department of Health and Human Services, Office of the Inspector General for approximately three years. The information contained in this affidavit is based upon my review of the evidence related to this investigation, including agency reports and consensual audio and video recordings involving an undercover operative (the "UC").

2. Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause to arrest, I have not described all of the relevant facts and circumstances of which I am aware. Additionally, except as otherwise noted, I have not differentiated between information

about which I have personal knowledge, and information received from other law enforcement sources or the UC.

3. In this affidavit, I have summarized certain portions of conversations that were recorded with the consent of the UC. Where specific recorded conversations are described, they are set forth in part and in substance, unless otherwise indicated.

4. Throughout this affidavit, my understanding and beliefs are expressly stated and are based on my experience and training in investigating cases involving health care fraud, my review of conversations recorded during the course of this investigation (including conversations not summarized in this affidavit), information obtained from fellow law enforcement officers and the UC, and my overall knowledge of and involvement in this investigation.

The Medicare Program

5. The Medicare Program ("Medicare") is a federal health care program providing benefits to persons who are over the age of 65 or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

4

6. Medicare is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

7. Medicare is subdivided into multiple Parts. Medicare Part B covers the costs of physicians' services and outpatient care, such as physical therapy, occupational therapy, and diagnostic tests. Generally, Medicare Part B covers these costs if, among other requirements, they are medically necessary and ordered by a physician.

8. Medical providers certified to participate in Medicare, whether clinics or individuals, are assigned a provider identification number ("PIN") for billing purposes. After a medical provider renders a service, the provider uses its PIN when submitting a claim for reimbursement to the Medicare contractor or carrier assigned to that provider's state.

9. Medical providers are authorized to submit claims to Medicare only for services that they actually rendered and are medically necessary, and providers are required to maintain patient records verifying the provision of services.

10. To receive reimbursement from Medicare for a covered service, a medical provider is required to submit a claim, either electronically or in writing, through Form CMS-1500 or UB-92. The claim must include information identifying the medical provider, the patient and the services rendered. By submitting the claim, the provider certifies, among other things,

5

that the services that were rendered to the patient were medically necessary.

Initiation of the Investigation into the Defendants

11. CMS opened an investigation of Medicare provider Dr. Jesse A. Stoff Medical, P.C., doing business as Solstice Wellness Center ("Solstice"), which purported to provide health care services at 230 Beach 102nd Street in Rockaway Park, New York, based on an analysis of the Medicare claims that were being submitted through Solstice. Based on a review of those claims, I know that Medicare paid Solstice over $800,000 in only two months (March to April 2009), and many beneficiaries listed on those claims were deemed "overutilized beneficiaries" ("OUBs"), i.e., Medicare beneficiaries who appear to be shared among a high number of different providers and who purported to receive an excessive volume of services.

The Fraudulent Scheme

12. Subsequently, law enforcement agents began an undercover operation at Solstice. On or about February 17, 2010, the UC entered Solstice posing as a Medicare beneficiary. The UC stated that he strained his back from shoveling snow and provided a Solstice employee with his Medicare information.

13. On or about February 17, 2010, in a recorded conversation between Dmitry Shteyman, an officer at Solstice, and the UC, Dmitry Shteyman offered a cash kickback to the UC in

6

exchange for visiting Solstice to receive purported medical treatments at Solstice. Subsequently, the UC began to make visits to Solstice.

14. On or about March 5, 2010, after six visits to Solstice, the UC was directed to wait to enter a room at Solstice where he would be paid his cash kickback (the "Kickback Room"). Approximately four patients entered and exited the Kickback Room, one at a time, before it was the UC's turn. Once inside the Kickback Room, another Solstice employee, Aleksey Shteyman, paid a cash kickback in the amount of approximately $300 to the UC for six previous visits that the UC made to Solstice. Aleksey Shteyman indicated to the UC that the cash kickback was based on the number of visits that the UC made to Solstice. Aleksey Shteyman advised the UC to put the cash in his pocket so that others would not see.

15. On or about March 19, 2010, another Solstice employee, Maxsim Shvedkin, paid a cash kickback in the amount of approximately $100 to the UC for two previous visits that the UC made to Solstice. This payment was also made in the Kickback Room.

16. On or about March 24, 2010, Maxsim Shvedkin paid a cash kickback in the amount of approximately $100 to the UC for two previous visits that the UC made to Solstice. This payment was also made in the Kickback Room.

17. On or about March 24, 2010, Maxsim Shvedkin offered to pay a cash kickback in the amount of approximately $50 to the UC for each and every Medicare beneficiary that the UC referred to Solstice to purportedly receive medical treatments at Solstice.

18. On or about March 31, 2010, Maxsim Shvedkin paid a cash kickback in the amount of approximately $150 to the UC for three previous visits that the UC made to Solstice. This payment was also made in the Kickback Room.

19. For visits that the UC made to Solstice, Dmitry Shteyman, Aleksey Shteyman and Maxsim Shvedkin submitted and caused to be submitted claims to Medicare seeking payment for services that Solstice purported to provide to the UC but that were actually either not provided or were not medically necessary.

20. The total amount of claims submitted to Medicare through Solstice, from approximately February 2009 to April 2010, is approximately $2,843,331.

21. Dmitry Shteyman, Aleksey Shteyman and Maxsim Shvedkin were indicted on charges of conspiracy, conspiracy to commit health care fraud, and health care fraud in United States v. Shteyman et al., CR No. 10-0347 (SJ)(SMG).

22. During several recorded visits that the UC made to Solstice, the UC witnessed and heard other patients openly

discussing kickbacks that they received for visits to Solstice. Patients acknowledged receiving $50 per visit while others discussed what they were owed for past visits. The UC also witnessed other patients going into and coming out of the Kickback Room.

23. On or about March 5, 2010, during a recorded conversation in which the defendant EVGENY GIL asked the UC questions about the UC's kickback payment, GIL acknowledged that he was also paid.

24. A cooperating witness ("CW"), who was a former employee at Solstice and has pled guilty to conspiracy to offer and pay illegal healthcare kickbacks, believed that patients were being paid by either Aleksey Shteyman or Maxsim Shvedkin in the Kickback Room. Patients asked her regularly about getting paid, and Dmitry Shteyman directed the CW to refer such patients to either Aleksey Shteyman or Maxsim Shvedkin. Some patients refused to receive medical services unless they were able to see either Aleksey Shteyman or Maxsim Shvedkin. The CW witnessed patients waiting to enter the Kickback Room to see either Aleksey Shteyman or Maxsim Shvedkin. Because neither Aleksey Shteyman nor Maxsim Shvedkin was a health care provider or managed appointments, the CW knew of no other reason why patients would need to see either Aleksey Shteyman or Maxsim Shvedkin other than to get paid money. The CW witnessed the defendants YEFIM

DRAKHLER, YEFIM KORNFELD, VALENTINA MUSHINSKAYA, SHELYA PINKSKAYA and VLADIMIR RUBIN enter the Kickback Room.

25. The CW and the UC described the Kickback Room as an office. The UC stated that the inside of the Kickback Room contained an office desk, and that on at least one occasion, Aleksey Shteyman paid him with cash taken out of a drawer from that desk. Neither the CW nor the UC saw any doctors or other health care professionals provide health care services in the Kickback Room.

26. Based on my training and experience, as well as consultation with other experienced health care fraud investigators and law enforcement agents, I know that people who pay cash kickbacks to beneficiaries to induce them to visit health care providers to supposedly receive medical services often keep a ledger or log to record kickbacks that are paid and owed to beneficiaries. These ledgers or logs will often include the name of the beneficiary in addition to other personal identifiers, some indication of what medical services or visits that the beneficiary supposedly received, the amount of money that is owed and/or paid to each beneficiary, and dates of payments and/or dates when medical services or visits were supposedly provided or made.

27. As part of this investigation, a former Solstice employee stated that patients at Solstice had asked for money for

receiving medical services at Solstice and that other Solstice employees talked about patients asking for money.

28. Subsequently, in approximately September 2009, this former Solstice employee presented law enforcement agents with several pages of a ledger that included the names of approximately 145 Medicare beneficiaries, the addresses and telephone numbers of several of those beneficiaries, an indication of the number of visits made by those beneficiaries, and what appears to be an amount of money each beneficiary was owed and/or paid for those visits (the "Kickback Ledger"). The Kickback Ledger appears to cover dates in March and April of 2009. All 145 beneficiaries who are listed in the Kickback Ledger are also listed on actual claims that were submitted through Solstice to Medicare in 2009.

29. The CW recognized handwriting in the Kickback Ledger as being that of Aleksey Shteyman.

30. Based on the amounts and the dates that appear in the Kickback Ledger, it appears that beneficiaries were paid approximately $45 per visit in March and April of 2009. The UC was paid approximately $50 per visit to Solstice in February and March of 2010.

31. The defendant YEFIM DRAKHLER's name and address appear in the Kickback Ledger. The Kickback Ledger also indicates that DRAKHLER was paid $450 on March 16, 2009, $315 on

11

March 26, 2009, and $180 on April 10, 2009. The claims data indicates that DRAKHLER visited Solstice on each of those days listed in the Kickback Ledger.

32. The defendant EVGENY GIL's name and address appear in the Kickback Ledger. The Kickback Ledger also indicates that GIL was paid $610 on March 24, 2009. The claims data indicates that GIL visited Solstice on March 24, 2009.

33. The defendant YEFIM KORNFELD's name and address appear in the Kickback Ledger. The Kickback Ledger also indicates that KORNFELD was paid $180 on March 25, 2009. The Kickback Ledger also indicates that KORNFELD was paid on April 10, 2009, but the amount of the payment is illegible. The claims data indicates that KORNFELD visited Solstice on March 25, 2009, and April 10, 2009.

34. The defendant VALENTINA MUSHINSKAYA's name appears in the Kickback Ledger. The Kickback Ledger also indicates that MUSHINSKAYA was paid $1005 on March 17, 2009, along with another beneficiary. The claims data indicates that MUSHINSKAYA visited Solstice on March 17, 2009.

35. The defendant SHELYA PINKSKAYA's name and address appear in the Kickback Ledger. The Kickback Ledger also indicates that PINSKAYA was paid $495 on March 13 or 14, 2009. The claims data indicates that PINSKAYA visited Solstice on March 13, 2009.

36. The defendant VLADIMIR RUBIN's name appears in the Kickback Ledger. The Kickback Ledger also indicates that RUBIN was paid $550 on March 16, 2009. The claims data indicates that RUBIN visited Solstice on March 16, 2009.

37. The defendants YEFIM DRAKHLER, EVGENY GIL, YEFIM KORNFELD, VALENTINA MUSHINSKAYA, SHELYA PINKSKAYA and VLADIMIR RUBIN are Medicare beneficiaries who also OUBs who appear to be shared among various medical providers and purport to receive an excessive volume of services.

38. The table below summarizes the approximate total amount of money billed to and paid by Medicare for each of the named defendants for the period in or about January 2004 through in or about February 2010, in addition to the approximate number of medical services each defendant was billed for and the approximate number of medical providers who submitted claims for each defendant:

| Defendant | Approximate Amount Billed | Approximate Amount Paid | Approximate Number of Medical Services | Approximate Number of Medical Providers |
|---|---|---|---|---|
| YEFIM DRAKHLER | $214,516 | $105,916 | 2719 | 124 |
| EVGENY GIL | $280,803 | $102,914 | 2558 | 104 |
| YEFIM KORNFELD | $263,452 | $100,687 | 2236 | 94 |
| VALENTINA MUSHINSKAYA | $259,902 | $141,161 | 3744 | 107 |
| SHELYA PINKSKAYA | $239,537 | $122,511 | 2612 | 97 |
| VLADIMIR RUBIN | $235,694 | $125,663 | 2758 | 130 |

13

\*   \*   \*

WHEREFORE, your deponent respectfully requests that the defendants YEFIM DRAKHLER, EVGENY GIL, YEFIM KORNFELD, VALENTINA MUSHINSKAYA, SHELYA PINKSKAYA and VLADIMIR RUBIN be dealt with according to law, and also, due to the nature of this application, that this affidavit and warrant be filed under seal until 8 a.m. on Friday, July 16, 2010.

                                    _____
                                    DANIEL CONNOR
                                    Special Agent
                                    United States Department of
                                        Health and Human Services
                                    Office of the Inspector General

Sworn to before me this
15th day of July, 2010

GE